UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

CNH INDUSTRIAL AMERICA LLC
*formerly known as* CNH AMERICA LLC,

    Plaintiff,

v.

JONES LANG LASALLE AMERICAS, INC.,

    Defendant.

Case No. 15-CV-981-JPS

ORDER

---

This case arises out of a contract dispute over a national marketing campaign. (*See generally* Docket #39). On June 24, 2016, and pursuant to Federal Rule of Civil Procedure 56, the plaintiff, CNH Industrial America LLC ("CNH"), moved for summary judgment with respect to: (1) its breach of contract claim; and (2) the defendant's, Jones Lange LaSalle Americas, Inc., ("JLL"), declaratory judgment counterclaim.[1] (Docket #74). That motion is now fully briefed and ripe for adjudication. (Docket #83, #87, #93).

---

[1]CNH's claim and JLL's counterclaim are essentially two sides of the same coin. On the one hand, CNH claims a breach of contract; on the other hand, JLL asks the Court to declare that certain obligations under that same contract either: (1) do not exist; or (2) have been fulfilled. (Docket #39, #14). CNH argues that an affirmative ruling in its favor with respect to the declaratory judgment claim necessarily follows if the Court likewise rules in its favor with respect to the breach of contract claim. (Docket #83 at 6). The Court notes that CNH's position, in this regard, is interesting. As described below, CNH argues that any affirmative defense not pled in JLL's *amended* answer is waived under Civil Local Rule 15 and Federal Rule of Civil Procedure 8. (Docket #93 at 11-15). However, CNH fails to acknowledge that JLL likewise did not re-plead its declaratory judgment claim in its amended answer. (Docket #43). However, as neither party raises this issue, and both parties continue to operate under the assumption that the declaratory judgment claim remains live in this action, the Court will not address the issue at this juncture.

As described more fully below, the Court concludes that numerous disputes of material fact exist in this case. Accordingly, an award of summary judgment pursuant to Rule 56 is inappropriate, and the Court will deny CNH's motion in its entirety. (Docket #74).

1. BACKGROUND[2]

    1.1   The Parties

CNH is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 700 State Street, Racine. (Docket #39 ¶ 1). It manufactures and sells farming and construction equipment through a network of dealers under several name plates, including the New Holland brand at issue in this action. (Docket #39 ¶ 1).

JLL is a corporation organized and existing under the laws of the State of Maryland, with its principal place of business located at 200 East Randolph Drive, Chicago, Illinois. (Docket #39 ¶ 2). It provides property management and project management services to clients, including clients within the borders of the Eastern District of Wisconsin. (Docket #39 ¶ 2).

    1.2   Undisputed Facts

In 2007, CNH began to undertake a corporate rebranding program for its New Holland Agriculture line of products (the "Rebranding Program"). (Docket #95 ¶ 1). The Rebranding Program would involve, among other things, the manufacture and installation of new signage at more than one thousand of its dealers in the United States and Canada. (Docket #95 ¶ 1).

---

[2]The facts will generally be taken from the parties' proposed findings of fact and the responses thereto. These facts and corresponding responses can be collectively found at Docket #95. To avoid confusion, the Court will note with specific notation the facts proposed by JLL. In addition, any disputes of fact will be noted accordingly.

CNH chose to retain a project manager for the Rebranding Program. (Docket #95 ¶ 2). CNH selected JLL for that position (Docket #95 ¶ 2), and, to that end, CNH and JLL entered into a Service Agreement on April 7, 2008 ("Service Agreement") (Docket #95 ¶ 3). Under the Service Agreement, JLL further negotiated agreements with three sign manufacturers—Icon Identity Solutions, Priority Signs, Inc., and Thomas Sign & Awning Company, Inc.—pursuant to which each would manufacture and install signs for the Rebranding Program. (Docket #95 ¶ 4). CNH was a third-party beneficiary under each of those three agreements. (Docket #95 ¶ 4).

The Service Agreement between CNH and JLL detailed various obligations on behalf of the parties. As it relates to this case, the Service Agreement imposed the following obligations on JLL:

    a.     To research and document warranty information for all raw materials and sub components;

    b.     To direct control and responsibility of all manufacturing, including quality control;

    c.     To negotiate the "best possible warranty" for the signs and to disclose all elements of the warranty program to CNH; and

    d.     To provide ongoing management services for warranties one-year from the date of uninstallation.

(Docket #95 ¶ 5).[3] The agreement also contains two provisions related to: (1) the "Acceptance of Deliverables," which requires a certain procedure be followed in the event of the delivery of "deficien[t] or nonconform[ing]"

---

[3] Although JLL's original claim for declaratory relief asserts that the Service Agreement does not contain some of these terms (Docket #14 ¶¶ 15, 19), JLL also does not dispute that the obligations described above derive directly from the language of the Service Agreement itself (Docket #95 ¶ 5). This apparent inconsistency is not addressed by the parties.

goods; and (2) a "Limitation on Liability," which caps damages in the event of a dispute between the parties. (Docket #95 JLL Proposed Fact ¶¶ 56, 58).[4] While the original Service Agreement was to remain in effect until December 16, 2011, the parties decided to extend it by way of various amendments until its termination on March 31, 2016. (Docket #95 ¶ 6).

Vinyl was an essential component to this sign-manufacturing process. The company selected to provide the vinyl for the Rebranding Program was Arlon. (Docket #95 ¶ 7). Specifically, the Arlon Series 2500 vinyl was chosen as the sole vinyl to be utilized for the project. (Docket #97 ¶ 8). Generally, five signs were manufactured and installed at each dealer location (one of which had two sign faces). (Docket #95 ¶ 9). Of those, two signs are owned by CNH. (Docket #95 ¶ 9). The other three signs are owned by the individual dealer. (Docket #95 ¶ 9).

Sometime after selecting Arlon as the vinyl supplier, JLL began negotiating the terms of the Arlon vinyl warranty. (Docket #95 ¶ 13). Though many factual disputes surrounding this negotiation are unresolved, the parties agree that the vinyl warranty that ultimately appeared in Exhibit E to the agreements made between JLL and the sign manufacturers stated: "Arlon Vinyl Extended Warranty B 7 year warranty on 1st surface. 2nd surface on exterior sign applications is 9 years. There is no charge for parts/labor/shipping for 1-year from date of installation." (Docket #95 ¶ 15). The parties also agree that the aforementioned language was not drafted by JLL. (Docket #95 ¶ 16). Rather, Adam Cook ("Mr. Cook"), JLL's assigned project manager until approximately the second quarter of 2009, testified that

---

[4]CNH objects to the inclusion of these proposed facts on the grounds that they are "immaterial." (Docket #95 JLL Proposed Fact ¶¶ 56, 58). However, as described further below, the Court will permit JLL to argue its position with respect to waiver and the Limitation of Liability provision, and, as such, they are relevant.

he "believed" that the language quoted above was drafted by one of the sign manufacturers. (Docket #95 ¶¶ 12, 16).

Two problems arose during the course of the sign manufacturing process. First, in late 2008, the vinyl delivered by Arlon began to check and crack when applied to the New Holland signs. (Docket #95 ¶ 24). Though the parties dispute the cause of the 2008 failure and manner in which it was resolved, it is undisputed that sign fabrication continued thereafter. (Docket #95 ¶¶ 24-31). Second, in late 2010 or early 2011, CNH began to receive additional reports from its dealers that signs fabricated and installed for the Rebranding Program were again failing due to cracking, checking and fading. (Docket #95 ¶ 31; *see also* Figures 1 and 2).



Figure 1: Representative New Holland Sign Prior to Failure



Figure 2: Representative New Holland Sign After Failure

As a result of the sign failures, CNH dealers went through a process of reporting failed signs to either CNH or JLL. (Docket #95 ¶ 34). If the failure was reported to CNH, then CNH would, in turn, report the failure to JLL. (Docket #95 ¶ 34). JLL would then initiate a claim with the sign manufacturer that manufactured the sign, and that sign manufacturer would then contact Arlon to initiate a warranty claim seeking payment for manufacture of a new sign face and its installation. (Docket #95 ¶ 34).

At this time, Arlon deemed product failures of the sort at issue to be failures for which the vinyl warranty would be available. (Docket #95 ¶ 33). And, until approximately mid-2014, Arlon agreed to pay the full replacement cost of sign faces on which its failed vinyl was affixed. (Docket #95 ¶ 36). At no point during this period of time did Arlon refuse to pay for any sign faces based upon the date of installation, the nature of the failure, or any other factor. (Docket #95 ¶ 36).

In mid-2014, however, Arlon stopped fully funding the replacement of sign faces. (Docket #95 ¶ 37). And, in August 2014, Arlon advised JLL that it would no longer fund remediation of any of the failed signs. (Docket #95 ¶ 40). Instead, Arlon offered to fund remediation of additional signs at a price of $3,000.00 per dealer site. (Docket #95 ¶ 40). CNH did not accept this offer, and instead entered into a Common Interest Agreement with JLL in December of 2014 to resolve various issues related to the failed signs. (Docket #95 ¶¶ 40-41).

Though JLL disputes the propriety of CNH's data gathering, CNH estimates that, to date, signs have failed and need to be replaced at 686 dealers across the country. (Docket #95 ¶¶ 42-44). Based on this number and CNH's recent sign remediation contract, CNH estimates that correcting the

remaining failed signs will cost CNH and its dealers no less than $5,382,875.00. (Docket #95 ¶ 44-45).

2. LEGAL STANDARD

When a party files a motion for summary judgment, it is their "contention that the material facts are undisputed and the movant is entitled to judgment as a matter of law." *Hotel 71 Mezz Lender LLC v. Nat. Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(a)). "Material facts" are those facts which "might affect the outcome of the suit," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, to have a genuine dispute about a material fact, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 474 U.S. 574, 586 (1986); namely, the party in opposition "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

"Where…the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claims." *Hotel 71 Mezz*, 778 F.3d at 601. In analyzing whether summary judgment should be granted, a court must draw all reasonable inferences from the materials before it in favor of the non-moving party. *Id.* When a court denies a motion for summary judgment, it "reflects the court's judgment that one or more material facts are disputed or that the

facts relied on by the motion do not entitle the movant to judgment as a matter of law." *Id.* at 602.

3. ANALYSIS

In its motion for summary judgment, CNH makes three arguments that the Court will address herein. (Docket #74). First, CNH argues that it is entitled to judgment as a matter of law with respect to its breach of contract claim against JLL. (Docket #74). According to CNH, JLL has breached the Service Agreement by:

    1.    Failing to document the warranty terms for the vinyl supplied by Arlon;

    2.    Failing to negotiate the "best possible warranty" from Arlon;

    3.    Failing to satisfy quality control obligations with respect to Arlon's provision of vinyl; and

    4.    Failing to properly administer the Arlon warranty.

(Docket #74). As a result of these four breaches, CNH argues that it is entitled to judgment as a matter of law against JLL in the amount of $5,382,875.00. (Docket #74). Second, for the same reasons that it prevails on the aforementioned breach of contract claim, CNH argues that the Court should dismiss JLL's declaratory judgment counterclaim. (Docket #74).[5] Finally, CNH argues that any defenses purportedly raised by JLL—namely, waiver and the Limitation of Liability provision—are waived under the local and federal rules of procedure because they were not properly pled in JLL's amended answer. (Docket #93).

---

[5] CNH fails to acknowledge that certain duties referenced in JLL's declaratory judgment claim differ from the duties that CNH now asserts that JLL breached for purposes of summary judgment. (*Compare* Docket #14 *with* Docket #74).

In response, JLL argues that factual disputes underlying both CNH's contract claim and its own declaratory judgment counterclaim preclude the entry of summary judgment in CNH's favor. (Docket #87). Moreover, JLL argues that its affirmative defense of waiver, and the Limitation of Liability provision appearing in the parties' Service Agreement, preclude, if not cap, CNH's recovery in this case. (Docket #87).

For the reasons described below, the Court concludes that: (1) genuine issues of material fact preclude the grant of summary judgment in CNH's favor; and (2) that JLL may argue the defense of waiver and the applicability of the Limitation of Liability provision, despite its failure to plead these positions in its amended answer.

3.1     Breach of Contract and Declaratory Judgment Claim

As described above, CNH's breach of contract claim and JLL's declaratory judgment claim raise similar, though not identical issues. At this juncture of the litigation, however, the Court is satisfied that a large body of disputed fact precludes the entry of judgment as a matter of law for CNH on either of the claims.

"The elements for a breach of contract in Wisconsin are familiar; the plaintiff must show a valid contract that the defendant breached and damages flowing from that breach." *Matthews v. Wisconsin Energy Corp. Inc.*, 534 F.3d 547, 553 (7th Cir. 2008) (citing *Northwestern Motor Car, Inc. v. Pope*, 51 Wis.2d 292, 296, 187 N.W.2d 200 (Wis.1971)).[6] Here, there is no question that CNH and JLL were bound by the Service Agreement. However, issues

---

[6]The parties agree that this Court, sitting in diversity, must apply the law of the State of Wisconsin. (Docket #83, #87). Having no independent basis from which to disagree, the Court will apply Wisconsin law to this case.

of material fact run through each of CNH's theories of breach, and, therefore, the Court will only highlight the most salient disputes below.[7]

### 3.1.1 Failure to Document and Negotiate the "Best Possible" Vinyl Warranty[8]

CNH claims that JLL breached the Service Agreement by failing to properly negotiate and document Arlon's vinyl warranty. However, much is unknown and disputed regarding the development of the terms of the warranty, and, more importantly, the parties dispute the actual terms of the warranty itself. (Docket #95 ¶¶ 13-23).

Regarding the vinyl warranty negotiations, the parties do not agree on the extent to which various actors were and/or should have been involved in the process. While on the one hand Mr. Cook testified that he "believed" that one of the sign manufacturer's drafted the warranty language, he does not remember the "details" of the negotiations. (Docket #95 ¶¶ 13, 16, 23). According to his testimony, the only portion of the negotiations that Mr. Cook remembers relates to a comparison of Arlon's warranty to 3M's warranty. (Docket #95 ¶ 13). Thus, because: (1) the parties did not provide the Court with any other testimony regarding the warranty's negotiations; and (2) there is no documentary evidence that catalogues or re-counts those negotiations, trial will serve to elucidate who participated in the negotiation

---

[7]The parties debate the extent to which causation comprises an element of a breach of contract claim in Wisconsin. (See Docket #83, #93). However, as described above, issues of fact underlie each of CNH's theories of breach. As a breach of the Service Agreement is undisputedly an element of CNH's breach of contract claim, the Court need not address this side dispute.

[8]As the same facts are offered in support of the duty to negotiate and duty to document theories of breach, the Court will address both of these theories, and the factual disputes corresponding to them, together.

process and the manner in which the negotiations proceeded. (Docket #95 ¶¶ 14, 17, 19).

Moreover, CNH provides the Court will no definition or comparative representation of what constitutes the "best possible warranty" for the vinyl at issue in this case. According to JLL, Mr. Cook engaged in at least some comparison of other company's warranties, *i.e.*, that of 3M's; and, according to JLL, Arlon's vinyl price and proposed warranty terms were superior to that of Arlon's competitors. (Docket #95 ¶ 13; Docket #95 JLL Proposed Fact ¶¶ 9-10, 19). Thus, without resolution as to a standard and/or comparison for industrial vinyl warranties, the Court cannot fairly determine whether JLL breached its duty to negotiate in this regard.

Even more to the point, the parties disagree on the ultimate outcome of the vinyl warranty negotiations. At bottom, the only documented language evidencing the warranty's negotiations is a thirty-three word statement that appeared in Exhibit E to the sign manufacturer's contracts with JLL. (Docket #95 ¶ 14). That language reads:

> Arlon Vinyl Extended Warranty B 7 year warranty on 1st surface. 2nd surface on exterior sign applications is 9 years. There is no charge for parts/labor/shipping for 1-year from date of installation.

(Docket #95 ¶ 15).

The parties actively dispute whether this statement accurately and completely describes Arlon's vinyl warranty. On the one hand, CNH has presented testimony from Arlon's Rule 30(b)(6) representative suggesting that the language does not contain standard warranty terms that are issued by the vinyl company. (Docket #95 ¶ 18). For its part, JLL's employees have offered three separate articulations of what the Arlon warranty's terms were, none of which correspond exactly to the quoted language above. (Docket #95

¶ 20). CNH also proffers a different interpretation of the warranty and its coverage for replacing and repairing failed signs. (Docket # 95 ¶¶ 15, 22).

To be sure, with so many disputed facts about the terms of the underlying warranty itself, the Court is satisfied that the grant of summary judgment with respect to JLL's duties to "negotiate" and "document" the same is inappropriate at this juncture.

### 3.1.3 Failing to Satisfy Quality Control Obligations

Next, CNH claims that JLL failed to satisfy its quality control obligations under the Service Agreement. At the heart of this theory are certain actions that were allegedly taken in response to an early failure in Arlon's vinyl in 2008. (Docket #95 ¶¶ 24-30).

In 2008, the Rebranding Program experienced an early interruption due to checking and cracking of the vinyl being placed on the New Holland signs. (Docket #95 ¶¶ 24-25). According to CNH, the 2008 vinyl failure is particularly critical because the testimony from former Arlon employees suggests that: (1) the issues underlying the 2008 vinyl failure also caused the systemic sign failures in dispute in this case; and (2) that certain employees from Arlon were aware of the defective vinyl all along and continued to sell it anyway. (Docket #95 ¶ 28). The parties dispute the extent to which JLL was aware and/or could have prevented this purportedly continuing vinyl failure. (Docket #15 ¶ 27).

While neither of the parties dispute that some sort of vinyl failure occurred in 2008 (Docket #95 ¶24), they do not agree as to the cause or nature of this failure. (Docket #95 ¶ 24). The parties also dispute what actions JLL took in response to the 2008 failure. (Docket #95 ¶25). While CNH asserts that JLL failed to make *any* inquiry of Arlon as to the cause of the failure, and simply accepted Arlon's assurance that the problem was found and cured,

JLL maintains that it continued to monitor the manufacturing and fabrication process to ensure the signs did not demonstrate any failures. (Docket #95 ¶ 25). Moreover, assuming JLL failed to intervene in the 2008 failure to the extent CNH now expects, Mr. Cook's testimony suggests that such actions may have been motivated by cost and/or time saving measures. (Docket #95 ¶ 25). CNH's knowledge of and/or involvement in the 2008 failure are facts neither of the parties address.[9]

Without resolution as to the circumstances of the 2008 failure, the actions taken by the parties in response to the 2008 failure, and whether the same problems underlying the 2008 failure actually caused the sign failures that began in late 2010 or early 2011, summary judgment on this theory of breach will not be granted.

### 3.1.4 Failure to Properly Administer Arlon Warranty

Finally, with respect to its fourth theory of breach, CNH argues that, once the signs began to systemically fail across the country, JLL breached its duty to properly administer Arlon's vinyl warranty. (Docket #95 ¶¶ 31-41). For obvious reasons, many of the factual disputes related to what the actual terms of Arlon's warranty were are relevant to this theory of breach. As an example, CNH argues that JLL failed to accurately inform CNH that Arlon's warranty did not require a full refund and replacement of failed signs for a full seven years. (Docket #95 ¶ 38). For its part, JLL maintains that CNH had access to the same warranty language that it argues control this case, namely,

---

[9]JLL does not dispute that it did not obtain written confirmation from Arlon that, should the same issue underlying the 2008 failure arise again, that Arlon would cover all costs associated with the remediation. (Docket #95 ¶ 26). However, as noted by JLL, CNH fails to point to the language in the Service Agreement that required such an action and/or how the quality control provision mandated this specific action. The Court expresses no opinion on this matter, but simply highlights what appears to be an unaddressed gap in CNH's theory.

that which was contained in Exhibit E to the sign manufacturer's contracts. (Docket #95 ¶ 38). The ultimate terms of the warranty and how/whether those terms were communicated among the parties are still open questions in this case.

CNH also posits that JLL failed to inform CNH of the warranty's approaching expiration date, despite JLL's *ability* to do so. (Docket #15 ¶ 39). As JLL highlights, it is unclear whether this fact supports CNH's theory of breach, as it does not appear that the Service Agreement explicitly required JLL to give advance notice of warranty expirations. (Docket #95 ¶ 39). Nonetheless, CNH maintains that JLL's failure to provide advance warning of the warranty's expiration undermined CNH's ability to take appropriate steps to avoid being left without warranty coverage for the failed signs. (Docket #95 ¶ 39).

In sum, because the facts outlined above, in conjunction with the actual terms of the Arlon warranty itself, are disputed, the Court will defer their resolution for trial.[10]

### 3.2 Defenses: Waiver and Limitation of Liability

Apart from the breach of contract claim, CNH also argues that JLL is not entitled to assert: (1) the defense of waiver; and (2) that CNH's damages should be capped in accordance with the Limitation of Liability provision articulated in the Service Agreement. (Docket #93). The Court concludes, however, that excluding further argument on these issues is not appropriate under the circumstances.

---

[10]Because the Court concludes that each of CNH's four theories of breach rest on a large body of disputed fact, the Court will also pend the resolution of damages for trial.

At bottom, CNH argues that both of JLL's purported defenses—*i.e.*, that of waiver and the Limitation of Liability provision—must fail because they were not properly pled in JLL's amended answer. (Docket #93). More specifically, with respect to waiver, CNH points out that JLL failed to comply with Civil Local Rule 15 by failing to re-plead the affirmative defense in its amended answer. *See* Civ. L. R. 15(a) ("Any amendment to a pleading, whether filed as a matter of course or upon a motion to amend, must reproduce the entire pleading as amended, and may not incorporate any prior pleading by reference."). In addition, because CNH argues that JLL's assertion of the Limitation of Liability provision is an affirmative defense, CNH claims that JLL violated Federal Rule of Civil Procedure 8(c) by failing to properly plead them.

Nonetheless, many courts facing similar technical violations have declined to impose such a harsh sanction as CNH proposes. *See, e.g.*, *Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC*, 684 F.3d 1211, 1222 (11th Cir. 2012) ("[I]f a plaintiff receives notice of an affirmative defense by some means other than pleadings, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice. When there is no prejudice, the trial court does not err by hearing evidence on the issue.") (internal citations omitted); *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1445 (6th Cir. 1993), *as amended on denial of reh'g* (Aug. 31, 1993) ("It is well established, however, that failure to raise an affirmative defense by responsive pleading does not always result in waiver."); *Charpentier v. Godsil*, 937 F.2d 859, 863 (3d Cir. 1991) ("It has been held that a 'defendant does not waive an affirmative defense if [h]e raised the issue at a pragmatically sufficient time and [the plaintiff] was not prejudiced in its ability to respond.'") (quoting *Lucas v. United States*, 807 F.2d 414, 418 (5th Cir. 1986)); *see also* 5 Charles A. Wright

Page 15 of 17

Case 2:15-cv-00981-JPS   Filed 08/15/16   Page 15 of 17   Document 122

& Arthur R. Miller, Fed. Practice and Procedure: Civil 2d § 1278. Instead of such a rigid approach, most courts ruling on motions to strike or related arguments consider both the notice-oriented purpose of Federal Rule of Civil Procedure Rule 8(c) and whether the failure to comply with the procedural requirement has caused undue prejudice. *See MCI Telecommunications Corp. v. Ameri-Tel, Inc.*, 881 F. Supp. 1149 n.21, 1158 (N.D. Ill. 1995) (collecting cases).

In this case, the Court concludes that the wiser exercise of discretion is to allow JLL to argue waiver and the Limitation of Liability provision.[11] With regard to waiver, CNH cannot fairly argue that it was not placed on notice of JLL's intent to assert this defense. Not only did JLL plead this defense in its original answer (Docket #14), but the Acceptance of Deliverables provision—which outlines the notice procedure for defective or non-conforming goods—is plainly a part of the contract upon which CNH is now suing. (Docket #95 JLL Proposed Fact ¶ 56). So too with respect to the Limitation of Liability provision. (Docket #95 JLL Proposed Fact ¶ 58). Even though JLL did not assert the liability provision in its answer, CNH cannot fairly say that it was not on notice of a provision that plainly existed in the very agreement that it now seeks to enforce. Moreover, in its reply brief, CNH provides the Court will no argument as to why and/or how it would be unduly prejudiced by allowing JLL to further these positions henceforth

---

[11]Case law is not clear on the issue of whether a contractual limitation on damages—such as the limited liability provision at issue here—should be construed as an affirmative defense. *See Carter v. United States*, 333 F.3d 791, 796 (7th Cir. 2003) (citing cases). Moreover, none of the Wisconsin cases relied upon by CNH conclusively hold that such a contractual term must be pled as an affirmative defense. (Docket #93 at 14). Nonetheless, even assuming the provision is properly considered an affirmative defense, the Court will allow it for the reasons stated above.

in the litigation. (Docket #93). Accordingly, the Court will allow JLL to present its arguments related to waiver and the Limitation of Liability provision at trial. *See MCI Telecommunications Corp.*, 881 F. Supp. at 1149 n.21 (concluding that "it would be manifestly unfair to permit [a party] to invoke certain provisions of the [contract] while crying surprise with respect to others").

4. CONCLUSION

In sum, the Court concludes that genuine issues of material fact preclude the granting of summary judgment in CNH's favor. In addition, the Court will permit JLL to address its waiver and Limitation of Liability arguments at trial.

Accordingly,

IT IS ORDERED that CNH's motion for summary judgment (Docket #74) be and the same is hereby DENIED.

Dated at Milwaukee, Wisconsin, this 15th day of August, 2016.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge